**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ANTHONY AHEDO,

      Petitioner,

-vs-                                           Case No.  8:07-CV-2356-T-27TBM

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

**ORDER**

Petitioner, an inmate of the Florida penal system, initiated this action by filing a Petition for

Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("petition") (Dkt. 1).  Petitioner challenges his

convictions for armed burglary, grand theft of a firearm, and grand theft entered in 2001 by the Sixth

Judicial Circuit Court, Pinellas County, Florida.  Respondent filed a response to the petition (Dkt.

12).  Petitioner filed a reply to the response (Dkt. 17).

The matter is now before the Court for consideration on the merits of Petitioner's claims.

An evidentiary hearing is not required for the disposition of this matter.  Rules Governing Section

2254 Cases 8(a) (2010).

**PROCEDURAL HISTORY**

Following a jury trial held November 6-8, 2000, the jury found Petitioner guilty of armed

burglary, grand theft of a firearm, and grand theft (Respondent's Ex. 1, Vol. II at pgs. 201-03).[1]  On

January 24, 2001, the court sentenced Petitioner as a career criminal to life in prison on the armed

burglary conviction, and five year prison terms on each grand theft conviction (Respondent's Ex. 2 -

Initial Brief at pg. 1).

      Given that Petitioner has not challenged Respondent's statement of the procedural history of

this case, a recitation of the procedural history of Petitioner's criminal conviction is unnecessary. The

issues are fully briefed and the case is ripe for decision.

## STANDARDS OF REVIEW

      Under 28 U.S.C. § 2254(d) and (e) as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"), this Court's review of the state court's factual findings must be

highly deferential. Such findings are presumed to be correct unless rebutted by clear and convincing

evidence. Similarly, the state courts' resolutions of issues of law-including constitutional issues-must

be accepted unless they are found to be "contrary to" clearly established precedent of the Supreme

Court of the United States or involved an "unreasonable application" of such precedent. *Williams*

*v. Taylor*, 529 U.S. 362 (2000).  It is not enough that the federal courts believe that the state court

was wrong; it must be demonstrated that the state court decision was "objectively unreasonable." *Id.*

*Breedlove v. Moore*, 279 F.3d 952 (11th Cir. 2002).

**Ineffective Assistance of Counsel Standard**

      To prevail on a claim of ineffective assistance of trial or appellate counsel, a Petitioner must

---

[1]Petitioner pled guilty to a severed count of aggravated fleeing and alluding (Respondent's Ex. 1, Vol. II at pgs. 206, 211).  He was sentenced to time served on that count (Id. at pg. 213).  He also pled no contest to a severed count of felonious possession of a firearm (Respondent's Ex. 2 - Initial Brief at pg. 1).  He was sentenced to a 15 year prison term on that count (Id.).

2

meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland's* two-part test requires a Petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. However, if a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.

**Procedural Default**

A § 2254 application cannot be granted unless a petitioner "has exhausted the remedies available in the courts of the State; . . ." 28 U.S.C. 2254(b)(1)(A); *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998). In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). *See also, Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir. 2003)("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.")(quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)); *Duncan v. Henry*, 513 U.S. 364 (1995)("[E]xhaustion of state remedies requires that the state prisoner 'fairly present' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights[.]'") (citation omitted).

Under the procedural default doctrine, "if the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). "The doctrine of procedural default was developed as a means of ensuring that federal habeas petitioners first seek relief in

3

accordance with established state procedures." *Henderson*, 353 F.3d at 891 (quoting *Judd v. Haley*, 250 F.3d at 1313).

Pre-AEDPA decisions from the Supreme Court establish the framework governing procedural default in federal habeas cases. A procedural default will only be excused in two narrow circumstances. First, petitioner may obtain federal habeas review of a procedurally defaulted claim if he shows both "cause" for the default and actual "prejudice" resulting from the default. "Cause" ordinarily requires petitioner to demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court. *Henderson*, 353 F.3d at 892; *Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995).

To show "prejudice," the petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his factual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). The petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different. *Henderson*, 353 F.3d at 892.

Second, a petitioner may obtain federal habeas review of a procedurally defaulted claim, without a showing of cause or prejudice, if such review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Henderson*, 353 F.3d at 892. This exception is only available "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Henderson*, 353 F.3d at 892. The fundamental miscarriage of justice exception concerns a petitioner's "actual" innocence rather than his "legal" innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001) (citing *Calderon*

4

*v. Thompson*, 523 U.S. 538, 559 (1998)); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986) (explaining a "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent"). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In addition, "'to be credible,' a claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon*, 523 U.S. at 559 (quoting *Schlup*, 513 U.S. at 324) (explaining "given the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected") (internal quotation marks omitted). The *Schlup* Court stated the petitioner must show constitutional error coupled with "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. This fundamental miscarriage of justice exception is not available unless "the petitioner shows, as a factual matter, that he did not commit the crime of conviction." *Ward v. Cain*, 53 F. 3d 106, 108 (5th Cir. 1995)(denying certificate of probable cause)(footnote omitted).

## DISCUSSION

### Ground One

In Ground One of his petition, Petitioner complains that trial counsel was ineffective in failing to timely alert the trial court that a juror was sleeping during critical portions of the trial.  In his reply, Petitioner clarifies his claim by asserting that counsel was ineffective in failing to alert the court on the second day of trial that the juror was sleeping during Hyman Ahedo and Jose Morales' testimony (Dkt. 17 at pgs. 3-4).  In his state Rule 3.850 motion, Petitioner asserted that the juror slept

5

"throughout most of the trial." (Respondent's Ex. 6, Vol. I at pgs. 5, 7).  He also asserted in his Rule 3.850 motion that even though counsel was aware that the juror was sleeping during critical portions of the trial, counsel did not inform the court that the juror had been sleeping until after the jury had retired to deliberate (Id. at pgs. 6-7).  Petitioner argued that because counsel waited until the jury retired to inform the court that a juror had been sleeping, the court was unable to observe the juror sleeping or question her regarding her inability to stay awake, and was unable to make a determination as to whether she needed to be replaced by the alternate juror or declare a mistrial (Id.)  Petitioner asserts that because the juror slept during critical portions of the trial, she was unable to make a fully informed decision regarding his guilt or innocence.  Thus, he argues, he was deprived of his right to a fair trial before six of his peers.

Petitioner raised this claim as ground one in his Rule 3.850 motion.  In denying ground one, the trial court stated:

> With respect to the sleeping juror issue, the material facts adduced at the evidentiary hearing are as follows: The Defendant testified that he noticed juror Juanita Smith sleeping during the testimony of Hyman Ahedo, the testimony of Jose Morales, defense's closing arguments, and jury instructions.  The Defendant stated he knew that Ms. Smith was sleeping because her eyes were shut and her head was nodding side-to-side, indicating she was going in and out of sleep. The Defendant alleged that he first brought the issue to his trial counsel's attention during Hyman Ahedo's testimony, but she told him to stop talking because he was breaking her concentration. The Defendant also alleges that he brought the issue up again after Hyman Ahedo finished testifying, but trial counsel told him that they would worry about it later. The Defendant stated that he brought the issue up a third time after Jose Morales testified. The Defendant also stated that he tried to tell the bailiff, but the bailiff told him not to interrupt the court proceedings. Finally, the Defendant stood up during closing arguments and informed the court hat he needed to confer with his trial counsel, but was again told not to interrupt the proceedings. The Defendant conceded that trial counsel did raise an objection to the juror at the end of trial, after the jury was sent out to deliberate, but it was not a matter of trial strategy agreed to by the Defendant to wait until this time to raise the objection.

Rose Barrios, the Defendant's aunt, also testified that she observed Ms. Smith sleeping during closing arguments and jury instructions. Ms. Barrios stated that she attempted to make eye contact with the judge and the prosecutor to bring the issue to the court's attention, but was never able to do so. However, Ms. Barrios also testified that she never made verbal contact with anyone regarding the juror.

Five of the jurors FN1 serving on the Defendant's jury testified at the evidentiary hearing. None of the jurors observed any juror sleeping during the proceedings, although three of the jurors testified that they had no specific recollection of Ms. Smith. However, all five of the jurors testified that all jurors actively participated in jury deliberations, and no one seemed lost or confused, or was asking questions as if she had missed portions of the trial testimony.

Finally, Maura Kiefer Glass, the Defendant's trial counsel, testified that she was first advised of the sleeping juror issue during jury instructions. Ms. Glass indicated that she saw the juror with her head down and eyes closed, but could not confirm that she was actually sleeping. Ms. Glass also stated that, as soon as the judge finished reading jury instructions, she approached the bench and raised the issue at that time. At that time, Ms. Glass asked that the alternate juror be used, but this court refused her request. Although Ms. Glass testified that she was not aware of the sleeping juror prior to jury instructions, she conceded that the trial transcript would more accurately reflect when she was first advised of the issue. FN2 Ms. Glass indicated that she did not object prior to the jury being excused because she saw no reason to interrupt the court during jury instructions and because the judge would have "bitten her head off."

FN1 Only the juror alleged to have been sleeping, Juanita Smith, was not questioned, as she is now deceased.

FN2 The trial transcript reflects that Ms. Glass advised this court that Ms. Smith "has been sleeping and has been point[ed] out by my client several times and I've also personally observed it...She's been sleeping throughout the trial....[S]he slept this morning and she slept yesterday." *See* Exhibit 1: Trial Transcript, p. 730. Trial counsel went on to say that she had "just noticed it" during her closing arguments and the State's opening arguments. *See* Exhibit 1, pp. 731-32. The presiding judge stated that he had not personally observed Ms. Smith sleeping and would not interrupt jury deliberations "based on some factual observations that may or may not have occurred and were not contemporaneously raised on the record." *See* Exhibit pp. 730-32. These statements do not conclusively establish when Ms. Smith was alleged to have been asleep or when trial counsel became aware of it.

. . . .

In ground one, the Defendant alleges his trial counsel was ineffective in

failing to timely object to the fact that a juror was sleeping during trial.  In order to successfully argue a claim of ineffective assistance of counsel, the Defendant must prove that counsel's performance was deficient and that the deficiency caused the Defendant to suffer prejudice. *Strickland v. Washington*, 466 U.S. 668 (1984)j.  To satisfy the prejudice test, the Defendant must show that a reasonable probability exists that the outcome would have been different absent the ineffective assistance. *Id.; Haliburton v. Singletary*, 691 So. 2d 466 (Fla. 1997).

In the instant case, this court finds no reasonable probability to believe that the juror in question, Ms. Smith, was asleep during trial, or at least during crucial portions of the trial. None of the five other jurors serving on the jury with Ms. Smith noticed that she was sleeping during any portion of the trial. These jurors also testified that no juror had any problems actively participating in jury deliberations or gave any signs of having missed portions of the trial testimony.

Additionally, the presiding judge at trial also stated on the record that he had not observed any juror sleeping. Although Ms. Kiefer indicated at the hearing that she saw the juror sleeping during jury instructions, she also conceded her recollection of events at trial were much better at the time than they currently are. At trial, Ms. Kiefer stated that she only observed the juror sleeping during the defense's closing arguments and the State's opening arguments. *See* Exhibit 1: Trial Transcript, p. 732. Accordingly, this court finds no credible evidence to conclude that the juror was sleeping during critical portions of the Defendant's trial, such as during the presentation of testimony or other evidence. Consequently, the Defendant has failed to establish that he was prejudiced by any failure on the part of his trial counsel, and this claim is denied. *See Bullis v. State*, 734 So. 2d 463 (Fla. 5th DCA 1999).

(Respondent's Ex. 6, Vol. II at pgs. 217-21).

The trial transcript reflects that just after the jury retired to deliberate, defense counsel informed the court that she had a motion (Respondent's Ex. 1, Vol. VI at pg. 730).  Defense counsel stated:

If I may, throughout the trial one of the jurors, the Spanish lady, has been sleeping and has been point [sic] out by my client several times and I've also personally observed it.  And I think in an abundance of caution we need to release her and substitute the alternate.  She's been sleeping throughout the trial.

(Id.).  Defense counsel subsequently stated that the juror "slept this morning and she slept yesterday."

(Id.).  The trial judge stated in pertinent part that he "did not observe, if that's Juanita Smith, I did

not observe her sleeping..." (Id.).

During the November 21, 2005 evidentiary hearing, Petitioner's aunt, Rose Barrios, testified that she saw the juror, Juanita Smith, sleeping during jury instructions (Respondent's Ex. 6, Vol. III at pgs. 11-12). Petitioner testified that the juror was sleeping "[t]hroughout the course of the whole trial...[,]" while Hyman Ahedo and Morales were testifying, during defense counsel's closing argument, and dury jury instructions (Id. at pgs. 31-32). Five other jurors who served on the jury testified (Id. at pgs. 70-94).[2] None of those jurors saw Juanita Smith sleeping during the trial (Id.). All of those jurors testified that each juror actively participated in deliberations, and that no juror seemed confused or asked questions about what had happened during the trial (Id.).

The state post-conviction court concluded that there was "no reasonable probability to believe that the juror in question, Ms. Smith, was asleep during trial, or at least during crucial portions of the trial." (Respondent's Ex. 6, Vol. II at pg. 220). This conclusion was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Petitioner fails to demonstrate either that counsel's performance was deficient or prejudice.

Moreover, even if his counsel's performance was deficient, Petitioner does not demonstrate prejudice. Under *Strickland*, to establish prejudice Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Here, even taking the evidence in the light most favorable to Petitioner, it merely shows that one of the six jurors failed to pay attention during significant portions of the trial. He does not establish that Ms. Smith's conduct, i.e., sleeping during portions of the trial,

---

[2]At the time of the evidentiary hearing, Juanita Smith was deceased (Respondent's Ex. 6, Vol. II at pg. 217).

affected the outcome of the trial. The other jurors testified that during deliberations, no juror appeared confused, and all jurors actively participated. There is no allegation that any other juror in addition to Ms. Smith was sleeping or otherwise inattentive during the trial. Under an ineffective assistance of counsel review, Ms. Smith sleeping during portions of the trial does not establish a reasonable probability that the outcome of his trial would have been different. *See Hall v. Groose*, 1994 U.S. App. LEXIS 2982, 1994 WL 50604, *2 (8th Cir. 1994) ("Hall did not assert a reasonable probability that the outcome would have been different had counsel objected to the sleeping juror.").

Petitioner has not shown that the adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, Petitioner is not entitled to habeas relief.

**Ground Two**

In Ground Two, Petitioner asserts that "[t]he trial court erred in failing to grant the Petitioner a [sic] evidentiary hearing based on ineffective assistance of counsel - BIAS [sic] JUROR." (Dkt. 1 at pg. 6). In his reply, Petitioner clarifies his claim by asserting that he "is not attacking the denial of a state evidentiary hearing sub judice." (Dkt. 17 at pg. 7). Instead, Petitioner asserts, "[t]he basis of this claim is the denial of due process of law since counsel's actions fell outside the wide range of reasonable competency afforded by the Sixth and Fourteenth Amendments..." (Id.). Thus, it is apparent from Petitioner's reply that the claim he intended to present in Ground Two of his petition is that counsel was ineffective in failing to move to strike juror Bonzani from the jury panel because she indicated that she would give greater weight to a law enforcement officer's testimony than to

10

non-law enforcement witnesses' testimony (Id. at pg. 12).

In his response, Respondent first asserts that the claim Petitioner raised in his state Rule 3.850 post-conviction motion is that counsel was ineffective in failing to move to strike the entire jury panel. Therefore, Respondent argues, the claim Petitioner raises in Ground Two of his federal habeas petition, ineffective assistance of counsel in failing to move to strike juror Bonzani, is different than the claim Petitioner presented in his state Rule 3.850 motion. Thus, Respondent argues that Petitioner's claim in Ground Two is unexhausted and procedurally defaulted. The Court agrees.

A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts. *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). To properly exhaust a claim, a petitioner must present the *same claim* to the state court that he urges the federal court to consider. *See Anderson v. Harless*, 459 U.S. 4, 7 (1982). Petitioner presented the state circuit court with the claim that counsel was ineffective in failing to move to strike the entire jury panel when the trial court offered him to do so (Respondent's Ex. 6, Vol. I at pgs. 9-12). In support of his claim, Petitioner quoted portions of the voir dire transcript where three jurors gave what Petitioner claimed were "equivocal, vacillating responses" that created "reasonable doubt as to their ability to [be] impartial.." (Id. at pgs. 9-10). The state circuit court framed Petitioner's claim as counsel was ineffective when he "failed to consult with [Petitioner] on the Court's offer to strike the entire jury panel." (Id. at pg. 38). In denying the claim, the state circuit court first determined that the trial court never offered to strike the entire jury panel (Id.). Second, the state circuit court determined that Petitioner did not show prejudice because one of the allegedly impartial jurors was an alternate whom was excused before deliberations, and the

record did not indicate that the other two jurors were actually biased (Id.).

On appeal from the denial of the Rule 3.850 motion, counsel for Petitioner attempted to recast Petitioner's claim as counsel was ineffective in failing to move to strike juror Bonzani for cause (Dkt. 7 - Initial Brief at Issue Three). In its Answer Brief, however, the State expressly raised Florida's procedural rules that foreclose argument on a claim not raised in a rule 3.850 motion (Respondent's Ex. 8 at pgs. 48-50). *See e.g., Griffin v. State*, 866 So. 2d 1, 11 n.5 (Fla. 2003) ("On appeal, Griffin alleges a new basis for his claim of judicial bias. He contends that the trial judge was a friend of the victim's father and that defense counsel was aware of this fact. However, this new claim is not properly before this Court. *See Doyle v. State*, 526 So. 2d 909, 911 (Fla. 1988) (finding that post-conviction claim raised for the first time on appeal was procedurally barred). Thus, we only consider the two grounds for recusal that Griffin raised in the circuit court."). In this circumstance, the appellate court's per curiam affirmance in Petitioner's collateral appeal is presumed to rest on the independent and adequate state procedural ground raised by the State. *See Bennett v. Fortner*, 863 F.2d 804, 807 (11th Cir.) ("[W]hen a procedural default is asserted on appeal and the state appellate court has not clearly indicated that in affirming it is reaching the merits, the state court's opinion is based on the procedural default."), *cert. denied*, 490 U.S. 1071 (1989). Thus, this Court concludes that Ground Two is procedurally defaulted. Petitioner has not shown cause and prejudice to overcome the procedural default and has failed to demonstrate that a fundamental miscarriage of justice will result if this Court does not reach the merits of this claim.

Accordingly, Ground Two does not warrant habeas corpus relief.

**Ground Three**

In Ground Three of his petition, Petitioner complains that the state trial court erred in failing

12

to grant him a new trial based on a *Brady* violation.[3]  Specifically, Petitioner asserts that the State

withheld a police surveillance videotape which could have been used to impeach testimony of two

officers, who indicated that they saw him while inside an automobile, and to impeach Hyman

Ahedo's testimony that he was unable to lift heavy items.  The state court rejected this claim in

Petitioner's Rule 3.850 motion after an evidentiary hearing:

> With regard to the *Brady* issue, the material facts are as follows: The videotape in question was published in its entirety at the evidentiary hearing. The tape depicts three males in a residential driveway, going into and out of an open garage of the residence. Although the tape is taken from some distance and is poor in quality, one can discern the men carrying different objects, some of which appear to be large. In the foreground of the tape is a white Mitsubishi Diamante facing sideways from the camera angle. At one point, one of the officers conducting surveillance can be heard asking the other officer if one of the men is Hyman Ahedo, but the second officer communicates some doubt that the individual is in fact Hyman. Towards the end of the tape, one of the men is seen lifting a large, white object, but there is nothing on the tape indicating what the object is. This court noted at the evidentiary hearing that there are no signs of struggle or physical exertion on the part of the person lifting the object, which would tend to indicate that the object was not extremely heavy.

> Sergeant Daniel Carron, an officer with the Pinellas County Sheriff's Office testified that, on May 27, 1999, two days after the burglary was committed, he conducted surveillance on the Defendant's home and videotaped this surveillance. Sergeant Carron testified that this tape depicts a white Mitsubishi Diamante which is the same vehicle in which the Defendant was seen riding two days earlier. Sergeant Carron stated that, on the date he saw the Defendant riding in the Diamante, he was traveling westbound when the Diamante pulled up to the left of his vehicle at an intersection. The Diamante's rear passenger window was partially down and Sergeant Carron, who was driving an SUV, was able to look down into the rear of the Diamante and see the Defendant inside. Sergeant Carron testified that he was able to see the Defendant not only through the open portion of the window, but also through the tinted glass of the window. This identification occurred in the early morning hours on May 26, 1999. Detective Carron also noted that, on the videotape, one is able to discern from one side of the vehicle a person walking past the other side of

---

[3] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment.").

the vehicle by looking through the car windows, which would indicate that the tinting was not so dark that it was impossible to see into the car.

The Defendant testified that the defense theory at trial was that Hyman Ahedo, the Defendant's brother, committed the burglary alone and then implicated his brother in exchange for a more lenient sentence. The Defendant stated that he was identified as an assailant based on Hyman's information to police and police surveillance. Hyman's trial testimony indicated that it was impossible for him to have acted alone in the burglary because he suffered from back injuries and was unable to lift anything weighing more than a few pounds. The Defendant stated that he first became aware of the videotape through an attorney in a federal case, and that he was advised of the tape's existence one to two years after the trial in the case at bar. The Defendant indicated that he had no knowledge of the tape prior to his trial. The Defendant stated that this tape depicts Hyman lifting free weights and a washing machine, and could have been used at trial to impeach Hyman's testimony regarding his inability to lift heavy objects. The Defendant also contends it could have been used to impeach the police officers' testimony that they were able to identify the Defendant through the dark tinting on the Diamante. The Defendant noted that the Diamante was not otherwise available at trial because it had been either sold or confiscated.

On cross-examination, the Defendant conceded that Hyman had been impeached at trial on at least five other grounds. Additionally, the Defendant conceded that the was aware that Hyman was involved in a civil lawsuit for his back injury, and that the defendant in that action may have taken surveillance video showing Hyman lifting drywall. The Defendant admitted that he never advised his trial counsel of the possible existence of this videotape.

Finally, Maura Kiefer Glass testified that, although she made discovery requests in this case, she was never provided with the videotape in question and was not aware of the existence of the tape prior to trial. However, Ms. Glass did concede that, in its answer to demand for discovery, the State indicated that it possessed at least one videotape, and that the tape was being made available for viewing at either the State Attorney's Office or the Pinellas County Sheriff's Office. Ms. Glass could not recall ever going to either office to view the videotape. Ms. Glass further testified that the tape could have been used at trial to impeach both the police officers regarding their identification of the Defendant in the Diamante on May 26, 1999, and Hyman Ahedo regarding his back injuries. She also stated that her advice to the Defendant regarding whether or not he should testify at trial may have been different had the tape been introduced. However, Ms. Glass admitted that the tape was of very poor quality and she could not identify which man on the tape was Hyman Ahedo.

. . . . .

14

In order to establish a *Brady* violation, the Defendant has the burden of proving that: 1) the State suppressed material, exculpatory information; 2) the information was not equally accessible to the defense and the prosecution, and the defense could not have obtained the information through the exercise of due diligence; and 3) this suppression resulted in prejudice to the Defendant so that confidence in the trial verdict was undermined. *Way v. State*, 760 So. 2d 903 (Fla. 2000), citing, *Stickler v. Greene*, 527 U.S. 263 (1999).

Based on the evidence summarized above, this court finds that the Defendant has failed to meet his burden in the instant case. At the outset, this court notes that there is some uncertainty as to whether the State actually suppressed the videotape in question or if this tape might have been available to the defense through the exercise of due diligence. At the evidentiary hearing, the State noted that, in its answer to Demand for Discovery, the State indicated that it possessed electronic surveillance of the Defendant's home or conversations to which the Defendant was a party. This form also indicates that this surveillance was available for inspection at the State Attorney's Office or Pinellas County Sheriff's Office. See Exhibit 2: State's Answer to Demand for Discovery. At the evidentiary hearing, the Defendant's trial counsel testified that she could not recall if she had gone to either office to inspect the electronic surveillance. Accordingly, it has not been conclusively determined that this evidence actually was suppressed or whether it was made available for inspection and simply never viewed by the defense.

Even assuming that this evidence was suppressed by the State and was not otherwise available to the defense, the Defendant failed to establish the prejudice prong of this claim. As indicated above, the tape depicted a white Mitsubishi Diamante with tinted windows. However, the tape demonstrates that it was possible to look through both rear windows of the vehicle and see out the other side, which indicates that it also would be possible to see a passenger inside the vehicle even with the rear windows fully closed. However, Sergeant Carron testified at the hearing that he was able to see the Defendant not only through the tinted windows, but also because the rear passenger window was partially down. Accordingly, it does not appear that the videotape would have offered viable impeachment evidence with regard to the officers' identification of the Defendant.

Additionally, this court finds that the tape would not have offered viable impeachment evidence against Hyman Ahedo. As indicated above, the poor quality of the tape makes it impossible to clearly identify any of the men depicted on the tape, or to discern if any of them are actually Hyman Ahedo. In fact, the tape's audio indicates that even the officers conducting the surveillance were unable to tell which, if any, of the men was Hyman Ahedo. Moreover, it is impossible to discern what types of items the person alleged to be Hyman was carrying. Given the limitations of the videotape, it is doubtful that the tape would have provided strong impeachment

15

evidence against Hyman. Therefore, the unavailability of this tape at trial cannot be said to have prejudiced the Defendant to such an extent that it undermines confidence in the trial verdict. This is especially true given that Hyman was extensively impeached at trial on other grounds. *See* Exhibit 1: Trial transcript, pp. 467-530.

Furthermore, by his own admission, the Defendant was aware of the possible existence of a surveillance video in Hyman's civil lawsuit that may have shown Hyman lifting heavy objects, thus impeaching Hyman's testimony to a greater degree than the police surveillance videotape. However, the Defendant failed to take any action to acquire this other video, or even to advise his attorney of its purported existence. Consequently, the Defendant failed to exercise due diligence in obtaining evidence that potentially could have impeached Hyman in the same manner as, and to a greater degree than, the surveillance video in question. Accordingly, the Defendant has failed to establish all elements of the alleged *Brady* violation, and this claim is denied.

(Respondent's Ex. 6, Vol. II at pgs. 218-22).

The failure of a prosecutor to disclose evidence favorable to a defendant upon request violates due process where the evidence is material to either guilt or punishment. *Brady*, 373 U.S. at 87; *Strickler v. Greene*, 527 U.S. 263, 280 (1999). Evidence favorable to an accused includes impeachment evidence as well as exculpatory evidence. *Giglio v. United States*, 405 U.S. 150, 154 (1972). To establish a *Brady* violation, Petitioner must prove: (1) that the government possessed evidence favorable to the defense; (2) that the defendant did not possess the evidence and could not obtain it with any reasonable diligence; (3) that the prosecution suppressed the evidence; and (4) that a reasonable probability exists that the outcome of the proceeding would have been different had the evidence been disclosed to the defense. *United States v. Meros* , 866 F.2d 1304, 1308 (11th Cir. 1989). A "reasonable probability" is one sufficient to undermine confidence in the outcome of the proceeding. *United States v. Bagley*, 473 U.S. 667, 682 (1985). Further, under the *Brady* rules the Government is not required "to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself." *United States v. Prior*, 546 F.2d 1254, 1259 (5th

16

Cir. 1977).

"The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). To meet this standard, Petitioner need not demonstrate that, after discounting the inculpatory evidence in light of the evidence in question, insufficient evidence existed to convict him. *See Taylor v. Singletary*, 122 F.3d 1390, 1395 (11th Cir. 1997). Rather, Petitioner must show that the suppressed evidence, reasonably taken, puts "the whole case in such a different light as to undermine confidence in the verdict." *Felker v. Thomas*, 52 F.3d 907, 911 (11th Cir. 1995) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

First, Petitioner does not meet his burden to prove that the State suppressed the surveillance videotape. In its Answer to Demand for discovery, the State indicated that it possessed electronic surveillance of Petitioner's home or conversations to which he was a party, and that the surveillance was available for inspection at either the State Attorney's Office or the Pinellas County Sheriff's Office (Respondent's Ex. 6, Vol. II at pgs. 221, 289). During the June 30, 2006 evidentiary hearing on Petitioner's Rule 3.850 motion, Petitioner's counsel admitted that she knew of the existence of at least one videotape (Id. at pg. 165). Further, although Petitioner's counsel initially appeared to indicate that she had gone to either the State Attorney's Office or the Sheriff's Office to attempt to view the videotape (Id. at pgs. 165-66), she subsequently conceded that she could not remember whether she had gone to either office to view the videotape (Id. at pgs. 166-67, 221). Thus,

17

Petitioner does not prove that the State suppressed the videotape.

Regardless, even if the State did suppress the videotape, Petitioner does not establish that a reasonable probability exists that the outcome of the proceeding would have been different had the evidence been disclosed to the defense. *United States v. Meros*, 866 F.2d at 1308. Petitioner's counsel testified during the evidentiary hearing that she could have used the videotape to impeach Hyman Ahedo regarding his testimony that he needed help to commit the robbery because he had injured his back and was unable to lift anything (Id. at 147-48). Counsel testified that the videotape showed Hyman Ahedo lifting what appeared to be heavy objects (Id. at pg. 168). Counsel also testified that the videotape could have been used to impeach the testimony of Sergeant Carron that while he was in a vehicle stopped next to the Mitsubishi Petitioner was riding in, that he was able to see Petitioner sitting in the back seat (Id. at pg. 148). Counsel testified during the evidentiary hearing in pertinent part that "[y]ou can't see through the windows in that videotape. They're fairly tinted. I think that would have called into doubt the accuracy of the detective's testimony." (Id.).

First, as to the claim that the videotape could have been used to impeach Sgt. Carron's testimony that he saw Petitioner riding in the backseat of the Mitsubishi, the state court judge presiding over the evidentiary hearing watched the videotape in its entirety. The videotape revealed that he could look through both of the rear windows on the Mitsubishi and see out the other side (Id. at pgs. 130-31, 222). Moreover, Sgt. Carron not only testified that he was able to see Petitioner through the glass portion of the rear window of the Mitsubishi, but also that he could see Petitioner because the rear window was partially open (Id. at pgs. 127-28). Thus, even if the videotape showed that the Mitsubishi windows were tinted, Sgt. Carron was still able to identify Petitioner in the rear of the Mitsubishi because the window was partially open.

18

Second, as to the claim that the videotape could have been used to impeach Hyman Ahedo's testimony that he was unable to lift heavy objects, after viewing the videotape the state judge determined in pertinent part that "the poor quality of the tape makes it impossible to clearly identify any of the men depicted on the tape, or to discern if any of them are [sic] actually Hyman Ahedo...[and]...it is impossible to discern what types of items the person alleged to by Hyman was carrying." (Id. at pg. 222). After watching the videotape and being asked if she recognized any of the men on the videotape, Petitioner's counsel testified in pertinent part that "it's a pretty bad tape, but I believe it to be Anthony Ahedo, Hyman Ahedo, and Gonzales." (Id. at pg. 145). Nonetheless, it is apparent from her testimony during the evidentiary hearing that the video was "pretty poor quality" (Id. at pg. 168), and that she could not positively identify any of the men on the videotape as Hyman Ahedo.   During cross-examination, the prosecutor asked Petitioner's counsel "maybe we should play the video and you can actually identify which of those men you believe is Hyman. Okay?" (Id. at pg. 175). Petitioner's counsel responded "Well, I would not be able to do that."   The best she could say was that "I believe one of them is Hyman and one of them is Anthony and one of them is Gonzales.  Based on what I know about the tape, okay, and the detective speaking on the tape, and I don't think there's any dispute that it's those men." (Id.).  Moreover, Petitioner admitted that before his trial he was aware of the possible existence of other video surveillance of Hyman Ahedo carrying heavy objects (Id. at pgs. 194-95).  That video was taken by a private investigator hired by the company Hyman Ahedo was suing in a civil lawsuit as a result of an elevator accident (Id. at pgs. 193-95).  *Cf. Parker v. Allen* , 565 F.3d 1258, 1277 (11th Cir. 2009) ("[T]here is no suppression if the defendant knew of the information or had equal access to obtaining it.").  Finally, Hyman Ahedo was significantly impeached by Petitioner's counsel, who extracted several

19

admissions from Hyman Ahedo concerning the inconsistent statements he made at various points throughout the case (Respondent's Ex. 1, Supp. IV at pgs. 467-530).

After reviewing the record, the Court concludes that there is no reasonable probability, had the videotape been disclosed to the defense, the result of the trial would have been any different.

The Florida courts' disposition of this claim was neither contrary to nor an unreasonable application of clearly established federal law. Accordingly, Ground Three does not warrant habeas corpus relief.

**Ground Four**

In Ground Four, Petitioner asserts that "[t]he trial court erred in failing to grant the Petitioner a [sic] evidentiary hearing based on IAC regarding erroneous jury instruction." (Dkt. 1 at pg. 9). In his reply, Petitioner clarifies his claim by asserting that he "is not attacking the denial of a state evidentiary [sic] In this federal court sub judice." (Dkt. 17 at pg. 21). Instead, Petitioner asserts, "the basis of this instant claim is the denial of the Petitioner's constitutional right to effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments..." (Id.). Thus, Petitioner's claim in Ground Four is that counsel was ineffective in failing to object to the court's instruction to the jury that proof of unexplained possession by an accused of property recently stolen by means of a burglary may justify a conviction of burglary.

In his response to Ground Four, Respondent asserts that Petitioner's claim is unexhausted and procedurally defaulted because Petitioner did not brief the claim with specific argument in his appeal of the denial of his Rule 3.850 post-conviction motion (Dkt. 12 at pgs. 38-41). The Court agrees. Petitioner raised this ineffective assistance of counsel claim in Ground III of his Rule 3.850 motion (Respondent's Ex. 6, Vol. I at pgs. 13-16). The state circuit court denied the claim (Id. at pg.

39). When Petitioner appealed the denial of his Rule 3.850 motion, he did not raise this claim in his Initial Brief to the appellate court (Respondent's Ex. 7).

"'[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process, including review by the state's court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003)(citing *O'Sullivan*, 526 U.S. at 845). To exhaust state remedies where a petitioner's post conviction motion has been denied, the petitioner must appeal the denial of the motion. *See, e.g., Leonard v. Wainwright* , 601 F.2d 807 (5th Cir. 1979). Since Petitioner did not raise this claim on appeal from the denial of his Rule 3.850 post-conviction motion, the claim is not exhausted for federal habeas corpus purposes. When it is clear that the unexhausted claim would be barred in state court due to a state-law procedural default, federal courts can treat the claim now barred by state law as no basis for federal habeas relief. *Snowden v. Singletary*, 135 F.3d at 736 (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991)).

In Florida, as in other jurisdictions, the appellate rules and decisional law require that issues not presented and argued in an initial brief are deemed abandoned or waived, and will not be considered by the reviewing court.  *See, e.g., Duest v. Dugger*, 555 So. 2d 849, 851-52 (Fla. 1990)(merely making reference to arguments in the lower court without further elucidation does not suffice to preserve issues, and those claims are deemed to have been waived); *Bondu v. Gurvich*, 473 So. 2d 1307, 1313 n. 1 (Fla. 3d DCA 1984)(despite fact that notice of appeal stated that petitioner was appealing certain additional actions of the trial court, the failure to challenge these actions in the initial brief results in abandonment of those challenges).

Ground Four is procedurally defaulted because Petitioner failed to raise the ground in his

appeal of the trial court's denial of post-conviction relief. Petitioner's waiver or abandonment of the this claim works as a procedural default for federal habeas corpus purposes. Petitioner has not shown cause and prejudice to overcome the procedural default and has failed to demonstrate that a fundamental miscarriage of justice will result if this Court does not reach the merits of this claim.

Further and alternatively, Petitioner fails to make a threshold showing of entitlement to relief under 28 U.S.C. § 2254 (d). The petition and record do not show that the state court decision denying this claim (see Respondent's Ex. 6, Vol. I at pg. 39) resulted in an unreasonable application of clearly established federal law or an unreasonable determination of the facts in Petitioner's case.

Accordingly, Ground Four does not warrant habeas corpus relief.

**Conclusion**

For the foregoing reasons, the Court finds that Petitioner is not entitled to federal habeas relief.

ACCORDINGLY, the Court **ORDERS** that:

1. The Petition for Writ of Habeas Corpus is **DENIED**  (Dkt. 1).

2. The **Clerk** shall enter judgment against Petitioner, terminate all pending motions, and close this case.

## CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

**IT IS FURTHER ORDERED** that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a certificate of appealability (COA).  Id.  "A [COA] may issue...only if the applicant has made a substantial

showing of the denial of a constitutional right." Id. at § 2253(c)(2).  To make such a showing,

Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the

constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve

encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting

*Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner cannot make the requisite showing in

these circumstances.

Finally, because Petitioner is not entitled to a COA, he is not entitled to appeal  *in forma*

*pauperis.*

**DONE and ORDERED** in Tampa, Florida, on ___*February 2ⁿᵈ*_____, 2011.

_____
JAMES D. WHITTEMORE
United States District Judge

SA:sfc
Copy to: Counsel of Record

23